# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MICHAEL SPATARO,

*Plaintiff*,

v.

Civil Action No. 14-198 (RDM)

DEPARTMENT OF JUSTICE,

*Defendant*.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the motion of the U.S. Department of Justice to dismiss or, in the alternative, for summary judgment. Plaintiff Michael Spataro, proceeding *pro se*, brought this Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, action against the Department seeking agency records that refer to him, including records from the criminal investigation that culminated in Spataro's trial and conviction before the United States District Court for the Eastern District of New York. Like many FOIA cases, much of the relevant history in this case occurred after suit was filed, and, as explained below, several searches conducted after Spataro brought suit have resulted in the production of responsive records. Today, the Court concludes that, with one exception, the Department's post-complaint searches were adequate, and it concludes that the Department has otherwise satisfied its obligations under FOIA. The sole remaining issue involves the fate of eleven documents that were damaged—but, perhaps, not lost—due to flooding caused by Hurricane Sandy. Because the status of those documents remains unclear, further proceedings remain necessary.

The Court will, accordingly, **GRANT** in part and **DENY** in part the Department's motion to dismiss or, in the alternative, for summary judgment. Dkt. 26.

## I. BACKGROUND

Plaintiff Michael Spataro is currently incarcerated at the Fort Dix Federal Correctional Institution. Dkt. 1 at 1. In 2006, he was convicted on charges of conspiracy to commit murder in aid of racketeering, assault with a dangerous weapon in aid of racketeering, and using and carrying a firearm during and in relation to a crime of violence. *See United States v. Persico*, 293 F. App'x 24, 25 (2d Cir. 2008). He was sentenced to 338 months' imprisonment. *Id.* In July 2013, Spataro submitted a FOIA request to the FBI, seeking all agency records "pertaining" to him, including all "main files" and "see reference files." Dkt. 1-2 at 2. Spataro's FOIA request further specified that it "concern[ed] in part" the criminal investigation leading up to his trial and conviction. *Id.* at 3 (referring to "Case No. 04-CR-911"); *see also United States v. Spataro*, No. 04-cr-911, 2006 WL 2010788 (E.D.N.Y. July 10, 2006).

The FBI responded that it was "unable to identify main file records responsive to" Spataro's request. Dkt. 1-4 at 2. Spataro appealed that determination, stressing that he was seeking "any and all records of any type that pertain to" him and that he was "placing no limitations on [this] request." Dkt. 1-5 at 2. He was not, in other words, limiting his request to records found in the FBI's "main file." That appeal was considered by the Department's Office of Information and Policy ("OIP"), which concluded that the FBI had "conducted an adequate, reasonable search" and had otherwise met its obligations under FOIA. Dkt. 1-6 at 2. With respect to Spataro's contention that the FBI had failed to conduct "a cross-reference search," OIP advised Spataro that he would need to provide additional information "to enable the FBI to determine with certainty [whether] any cross-references it [might] locate," were, in fact, related to Spataro. *Id.* OIP suggested that Spataro might satisfy the FBI's need for additional information by, among other things, providing "the specific circumstances in which [he] had

contact with the FBI," the dates and locations of "such contact," his Social Security number, date

of birth, and home address, and the names of any relevant associates of his. *Id.* at 2–3.

Rather than provide those details, Spataro brought this FOIA action against the FBI. *See*

Dkt. 1 at 1. Shortly after Spataro brought suit, the FBI requested that the Court issue a "stay of

proceedings to permit [it] to locate and process all available responsive records." Dkt. 12 at 1.

The Court granted that motion, ordered the substitution of the Department of Justice in place of

the FBI, and ordered that the Department "file periodic status reports every 30 days until such

time as processing of the records responsive to Plaintiff's [FOIA] requests [was] completed."

Dkt. 15. Over the course of the next several months, the Department identified potentially

responsive documents, produced over two hundred pages with certain redactions, and withheld

other records pursuant to various FOIA exceptions. *See* Dkts. 16–19. The FBI also identified

(1) "approximately [eleven] potentially responsive documents which had reportedly been stored

in a closed file facility in New Jersey that sustained significant flood damage during Hurricane

Sandy," Dkt. 16 at 3, and (2) "[f]our potentially responsive documents," which it was "unable to

. . . locate[] [in the New York Field Office] even after extensive efforts," Dkt. 18 at 2. With

respect to the flood-damaged documents, the Department explained:

> Eleven potentially responsive documents were damaged in the flood that occurred
> on October 29, 2012. Remediation is ongoing for the damaged records in that
> facility. At this time, the FBI is unable to determine if or when those records
> affected by the flood may become available for review. Even assuming these
> documents were to become available at some later date, the FBI cannot be certain
> that they actually contain responsive information.

*Id*. at 2–3. Despite the unavailability of these fifteen documents, the Department reported that "it

ha[d] produced all releasable materials located that were responsive to [Spataro's] FOIA

request." Dkt. 19 at 2. The Department suggested that the Court nonetheless leave the stay in

place to provide Spataro with time to review the production and to "report[] back to the Court on

whether some or all of the issues have been resolved to his satisfaction." *Id*.  It subsequently

requested that the Court order Spataro to file a status report "identifying any issues remaining to

be decided in the matter."  Dkt. 21-1 at 1.  Spataro, in turn, filed a motion for leave to amend his

complaint to do just that.  *See* Dkt. 23.  The Court granted his motion, and denied as moot the

Department's request that the Court order Spataro to identify the issues still in dispute.  *See*

Minute Order (Feb. 11, 2015).

    Spataro's amended complaint identifies those aspects of the FBI's search and production

that he contends fail to comply with FOIA.  First, he identifies seventy pages of records that he

contends were improperly redacted pursuant to FOIA Exemptions 6, 7(C), and 7(D).  Dkt. 24 at

1–3 (Am. Compl. ¶¶ 4, 8, 12).  Second, he objects to the FBI's failure to produce the eleven

documents that were apparently damaged during Hurricane Sandy.  *Id.* at 2–4 (Am. Compl. ¶¶ 5,

9, 15–18).  Third, he identifies 143 pages that the FBI evidently withheld from a production on

July 31, 2014, and alleges that the FBI has failed to explain what happened to those records.  *Id*.

at 4 (Am. Compl. ¶¶ 19–20).  Fourth, without identifying a legal deficiency, he notes that the

FBI withheld six pages of records pursuant to FOIA Exemption 3 and Title III, 18 U.S.C. § 2510

*et seq*.  *Id*. (Am. Compl. ¶ 21).  Fifth, he observes that the FBI did not produce fourteen pages of

records in its September 2014 production, "without [a] clearly defined or stated justification."

*Id.* (Am. Compl. ¶ 22).  And, finally, he alleges generally that the FBI's reliance on FOIA

Exemption 7(C) and 7(D) was improper due to the Department's disclosure of certain

information at issue at his trial and due to "the Government's misconduct."  *Id.* at 4–7 (Am.

Compl. ¶¶ 23–34).

    In response to the amended complaint, the Department filed the pending motion to

dismiss or, in the alternative, for summary judgment, Dkt. 26, along with the declaration of

4

David M. Hardy, the Section Chief of the Record/Information Dissemination Section ("RIDS") of the FBI's Records Management Division, detailing the steps taken by RIDS in responding to Spataro's FOIA request. *See* Dkt. 26-1. Despite the breadth of his amended complaint, Spataro's opposition brief raises only two objections. First, he contends that "the search for responsive records in this case was inadequate" because (a) the FBI "declare[d] that remediation is ongoing respecting the [eleven] potentially responsive records that were stored at a closed file storage facility in New Jersey," and (b) under the facts as presented by the Hardy declaration, "a reasonable search was not effected concerning" the four potentially responsive documents from the New York Field Office that the FBI was unable to locate. Dkt. 27 at 3–4. Second, he "avers that the FBI has not provided a V[aughn] index and thus hinders Plaintiff's ability to respond appropriately to its motion for summary jud[g]ment." *Id.* at 6.

The factual record, however, has continued to evolve. After Spataro filed his opposition, the Department twice requested additional time to file its reply. *See* Dkt. 28; Dkt. 29. In the first request, the Department asserted that it "anticipate[d] the need to secure a supplemental declaration" regarding "why some documents cannot be located following a flood at the building where they were stored before it was struck by [H]urricane Sandy." Dkt. 28 at 2. That motion was granted. Minute Order (May 14, 2015). The second request explained that the FBI was continuing to investigate the status of the records affected by Hurricane Sandy. Dkt. 29 at 2. That request also advised the Court that the FBI "had located three [of the] missing file volumes" from the New York Field Office and that the FBI needed time to review those files to determine whether they contained any responsive records. *Id.* The Court granted that request for an extension, and it ordered that the parties file status reports in several weeks advising the Court

(1) whether any additional records were found and released and (2) whether any further release of records mooted portions of the dispute. *See* Minute Order (June 10, 2015).

The Department's status report indicated that "the formerly missing documents . . . were subsequently located" and that RIDS "received the records and processed them," ultimately releasing all "non-exempt portions of the responsive records." Dkt. 30-1 at 1. As explained in greater detail in the second declaration of David Hardy, the FBI determined that one of the four missing files "was an exact duplicate" of records already released, that a second file contained forty-eight pages referring to Spataro, and that "the two remaining cross-references . . . were on the inventory list of" files damaged by Hurricane Sandy and were "awaiting remediation." Dkt. 33-1 at 4–5 (Second Hardy Decl. ¶¶ 6–8). Based on these developments, the FBI argued that the issue regarding the previously missing New York Field Office files was now moot. Dkt. 30 at 2.

Shortly thereafter, the Court ordered that Spataro indicate whether he intended to challenge any of the redactions made to the recently released records, and set a schedule to complete the briefing on the Department's motion to dismiss or, in the alternative, for summary judgment. Minute Order (July 31, 2015). In response to that order, Spataro (1) challenged the FBI's application of FOIA Exemption 3 to what he characterized as "a pre-Title III check;" (2) renewed his opposition to Defendant's motion to dismiss, or in the alternative, for summary judgment; (3) again questioned the status of the flood-damaged records; and (4) requested both a *Vaughn* index and *in camera* review of the documents that he argued contained excessive redactions. *See* Dkt. 31. And, in yet another filing, Spataro elaborated on his objections to the redactions in the recent production, arguing that the FBI improperly redacted "'PRE-TITLE III' preliminary checks, made in advance of seeking to secure TITLE III authorization" and that "[t]he exemptions claimed under [5 U.S.C. § 552(b)(6)] . . . would clearly not have been the

subject of redaction, and [§ 552(b)(7)(C)] . . . likewise, would not have constituted the material redacted." Dkt. 32 at 1–2.

Pursuant to the Court's order, the Department then filed its reply brief in support of its long-pending dispositive motion. *See* Dkt. 33. Finally, the Court entered an order cautioning Spataro that the Court would accept as true any uncontroverted facts submitted by the Department and allowing Spataro to make a further filing within thirty days. Dkt. 34. To date, Spataro has declined to accept that invitation.

## II. LEGAL FRAMEWORK

The Freedom of Information Act is premised on the notion that an informed citizenry is "vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). It thus mandates that an agency disclose records on request, unless they fall within one of nine exemptions. "These exemptions are explicitly made exclusive and must be narrowly construed." *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011) (citation and quotation marks omitted). As relevant here, Exemption 3 "provides that FOIA's disclosure obligation 'does not apply to matters that are . . . specifically exempted from disclosure by [another] statute,' if the statute '(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue,' or '(ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld.'" *Labow v. U.S. Dep't of Justice*, 831 F.3d 523, 527 (D.C. Cir. 2016) (quoting 5 U.S.C. § 552(b)(3)(A)). Exemption 6 protects information about individuals in "personnel and medical files and similar files" when its disclosure "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemptions 7(C) and 7(D) protect from disclosure "records or information compiled for law

enforcement purposes," but "only to the extent that" disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy," *id*. § 552(b)(7)(C), or "could reasonably be expected to disclose the identity of a confidential source . . . [or] information furnished by a confidential source," *id*. § 552(b)(7)(D).

"FOIA cases are typically resolved on motions for summary judgment under Federal Rule of Civil Procedure 56." *Shapiro v. U.S. Dep't of Justice*, 153 F. Supp. 3d 253, 268 (D.D.C. 2016). To prevail on a summary judgment motion, the moving party must demonstrate that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "In a FOIA action, the Court may award summary judgment to an agency solely on the basis of information provided in affidavits or declarations that describe '. . . the justifications for nondisclosure [of records] with reasonably specific detail . . . and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *Thomas v. FCC*, 534 F. Supp. 2d 144, 145 (D.D.C. 2008) (quoting *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)). The Court reviews the agency's decision *de novo*, and the agency bears the burden of sustaining its action. 5 U.S.C. § 552(a)(4)(B).

### III. ANALYSIS

The Department argues that (1) it has sufficiently justified its withholdings under FOIA Exemptions 3, 6, 7(C), and 7(D); and (2) its search for records responsive to Spataro's FOIA request was adequate. The Court discusses each argument in turn.

### A. Withholdings

The Department bears the burden of identifying "the specific statutory exemption relied upon" in withholding records and demonstrating "that the exemption applies to the documents in question." *Jordan v. U.S. Dep't of Justice*, 591 F.2d 753, 779 (D.C. Cir. 1978) (en banc). Here,

the Department identifies four statutory exemptions to justify the FBI's redactions and withholdings. As explained below, the Court concludes that most, but not all, of these redactions and withholdings were proper, as was the FBI's decision not to provide a formal *Vaughn* index.

1. *Exemption 3*

Exemption 3 shields from disclosure all records that are "specifically exempted from disclosure by statute," so long as the statute upon which the agency relies either "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue" or "establishes particular criteria for withholding or refers to particular types of matters to be withheld." [1] 5 U.S.C. § 552(b)(3)(A). "Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents" and more on "the existence of a relevant statute and the inclusion of withheld material within that statute's coverage." *Goland v. CIA*, 607 F.2d 339, 350 (D.C. Cir. 1978). The Department asserts that the non-disclosure provisions of 18 U.S.C. §§ 2510–2520, 18 U.S.C. § 3123, and Federal Rule of Criminal Procedure 6(e) authorize it to withhold various types of information from the records responsive to Spataro's FOIA request. Dkt. 26 at 7–9. Because Spataro has not challenged any withholdings justified by the latter two exemptions, the Court restricts its inquiry to those linked to the non-disclosure provisions of Title III of the Omnibus Crime Control and Safe Streets Act ("Title III"), 18 U.S.C. §§ 2510–2520. Specifically, Spataro disputes only the withholding of "PRE-TITLE III checks," which he defines as "preliminary checks, made in advance of seeking to secure TITLE III authorization." Dkt. 32 at 1. He argues that these checks "would not be . . .

---

[1] The exemption also provides that any statute "enacted after the date of enactment of the OPEN FOIA Act of 2009," Pub L. No. 111–83, § 564, 123 Stat. 2142, 2184 (2009), must "specifically cite[] to" the exemption. 5 U.S.C. § 552(b)(3)(B). The statutes relied upon by the Department predate the OPEN FOIA Act.

exempt under 18 U.S.C. [§] 2518 as represented," but that the FBI has nevertheless refused to produce the notes that Spataro believes would result from such checks. *See* Dkt. 31 at 2.

Title III establishes a comprehensive regime regulating the procurement, use, and disclosure of federal law enforcement wiretaps. To obtain a wiretap, a law enforcement officer must submit an application "in writing upon oath or affirmation to a judge of competent jurisdiction." 18 U.S.C. § 2518(1). The statute requires that such an application include "the identity of the investigative or law enforcement officer making the application, and the officer authorizing the application" and a "complete statement of the facts and circumstances" giving rise to the application. *See id*. § 2518(1)(a)–(b). If the judge concludes that the statutory requirements are met, he or she "may enter an *ex parte* order" authorizing the wiretap. *Id*. § 2518(3). Title III provides that any communications intercepted by the wiretap shall be recorded "if possible," *id*. § 2518(8)(a), and that the recordings shall be used only by law enforcement officers "to the extent such use is appropriate to the proper performance of [their] official duties," *id*. § 2517. More importantly for present purposes, Title III also provides that the "[a]pplications made and orders granted" for the authorization of wiretaps shall be sealed and "disclosed only upon a showing of good cause." *Id*. § 2518(8)(b).

In support of its motion, the Department offers two declarations from David Hardy, the Chief of RIDS. See Dkt. 26-1 (First Hardy Decl.); Dkt. 33-1 (Second Hardy Decl.). In both declarations, Hardy attests that "the information withheld from disclosure pursuant to the provisions of Title III consists of the identities of the individuals targeted for interception through wiretap[] and information obtained via the Title III wiretap." Dkt. 26-1 at 16–17 (First Hardy Decl. ¶ 39); Dkt. 33-1 at 8 (Second Hardy Decl. ¶ 17). The Hardy declarations' delineation of the material withheld thus implies that, despite Spataro's belief that notes

produced prior to Title III applications exist, the FBI did not withhold any such "pre-Title III Checks" under Exemption 3. To the extent that understanding is incorrect—and the FBI withheld information that was produced in advance of seeking Title III authorizations and that was not used in the actual applications, *see Ewell v. U.S. Dep't of Justice*, 153 F. Supp. 3d 294, 304 (D.D.C. 2016)—the FBI has not adequately justified its interpretation of the scope of Exemption 3. Although it is possible—or even likely—that such information would be subject to one or more FOIA exemptions, the Court cannot grant summary judgment in favor of the FBI on this question without further clarification of what exactly was withheld. The Court considers, then, only the FBI's withholding of "the identities of the individuals targeted for interception through wiretap[] and information obtained via the Title III wiretap." Dkt. 26-1 at 16–17 (First Hardy Decl. ¶ 39); Dkt. 33-1 at 8 (Second Hardy Decl. ¶ 17).

Neither type of information need be disclosed. Under D.C. Circuit precedent, "'intercepted communications' obtained pursuant to a Title III wiretap fall 'squarely within the scope' of Exemption 3." *Ewell*, 153 F. Supp. 3d at 304 (quoting *Lam Lek Chong v. DEA*, 929 F.2d 729, 733 (D.C. Cir. 1991)). The same is true of the wiretap application (along with all supporting material) and the court's orders authorizing the wiretap, which Title III contemplates will be issued in an *ex parte* proceeding. *See* 18 U.S.C. § 2518(3); *see also Ewell*, 153 F. Supp. 3d at 304; *Sinito v. U.S. Dep't of Justice*, No. 87-814, 2000 WL 36691372, at *6 (D.D.C. July 12, 2000); *Butler v. U.S. Dep't of Justice*, No. 86-2255, 1994 WL 55621, at *8–9 (D.D.C. Feb. 3, 1994). Moreover, because a court's order authorizing a wiretap is protected, the same is also true of the identity of the person "targeted" for interception; a person's status as a "target" exists solely by virtue of the substance of the court's *ex parte* order, and thus all information regarding that status is necessarily derived (directly or indirectly) from the court's order. *See* 18 U.S.C.

§ 2518(4)(a) (requiring that the *ex parte* court order shall "specify . . . the identity of the person . . . whose communications are to be intercepted"). The Court, accordingly, concludes that the identity of the person targeted by the wiretap falls within the exempt information. *See Roberts v. FBI*, 845 F. Supp. 2d 96, 101–02 (D.D.C. 2012); *see also Pinson v. U.S. Dep't of Justice*, 177 F. Supp. 3d 56, 81–82 (D.D.C. 2016); *Miller v. U.S. Dep't of Justice*, 872 F. Supp. 2d 12, 22–23 (D.D.C. 2012).

2. *Exemptions 6 and 7(C)*

Spataro next disputes the Department's application of Exemptions 6 and 7(C) to redact information from approximately seventy pages of records released between July and September 2014, *see* Dkt. 24 at 1–3, and another forty-eight pages released in July 2015, *see* Dkt. 31 at 1. The only arguments he offers in support of his challenge to the redactions in the 2014 productions are (1) that they "shield probable evidence of misconduct on the part of the Government," Dkt. 24 at 7 (Am. Compl. ¶ 33); and (2) that they relate to a cooperating witness who testified against Spataro at trial, Dkt. 24-4 at 10–12 (Spataro Decl.). The withheld information is necessary, in Spataro's view, to demonstrate inaccuracies in that witness's testimony and to shed further light on the cooperator's agreement with the Government. *Id.* With respect to the redactions in the 2015 production, Spataro argues that "[t]he exemptions claimed under [Exemption 6] . . . would clearly not have been the subject of redaction, and [Exemption 7(C),] likewise, would not have constituted the material redacted." Dkt. 32 at 2.

Exemptions 6 and 7(C) "seek to protect the privacy of individuals identified in certain agency records." *ACLU v. U.S. Dep't of Justice*, 655 F.3d 1, 6 (D.C. Cir. 2011). Under Exemption 6, "personnel and medical files and similar files" may be withheld if disclosure "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Under Exemption 7(C), "records or information compiled for law enforcement purposes" may be

withheld "to the extent that" disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." *Id.* § 552(b)(7). The D.C. Circuit has long applied a categorical rule under Exemption 7(C)—known as the "*SafeCard* rule"—"permitting an agency to withhold information identifying private citizens mentioned in law enforcement records, unless disclosure is 'necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity.'" *Schrecker v. U.S. Dep't of Justice*, 349 F.3d 657, 661 (D.C. Cir. 2003) (quoting *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1206 (D.C. Cir. 1991)). This rule covers the redaction of "names of FBI or other federal government personnel," as well as the names or other identifying information relating to individuals "who have not previously been publicly implicated in the . . . investigation." *See Citizens for Responsibility and Ethics in Washington v. U.S. Dep't of Justice* (*CREW II*), 854 F.3d 675, 681 (D.C. Cir. 2017). However, when the "privacy interests" of those who the Government seeks to protect "have been diminished by prior disclosures, including through guilty pleas and convictions" that occurred "in connection with" the investigation giving rise to the disputed records, "the withholding of information pursuant to Exemptions 6 and 7(C) must be subjected to a particularized weighing of the public and privacy interests that would implicated by the disclosure sought." *Id.* at 682–83.

As an initial matter, when the information at issue was "'compiled for law enforcement purposes,' thus implicating Exemption 7(C)," the Court has "no need to consider Exemption 6 separately because all information that would fall within the scope of Exemption 6 would also be immune from disclosure under Exemption 7(C)." *Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1173 (D.C. Cir. 2011). Thus, the Court need only analyze whether the FBI has properly invoked

Exemption 7(C).[2]  Whether information was gathered for law enforcement purposes turns on "how and under what circumstances the requested files were compiled . . . and whether the files sought relate to anything that can fairly be characterized as an enforcement proceeding." *Jefferson v. Dep't of Justice, Office of Prof'l Responsibility*, 284 F.3d 172, 176–77 (D.C. Cir. 2002) (internal quotation marks and citation omitted).  Applying that test, there is little doubt that the records involved in this case were compiled for law enforcement purposes, a fact not disputed by Spataro.  *See* Dkt. 1-5 at 2 ("It is inconceivable that your office would claim there were no responsive records to my request.  I have been arrested, indicted, and thereafter prosecuted, based upon investigation(s) involving the Federal Bureau of Investigation . . . .").

Because the disputed redactions are contained in records "compiled for law enforcement purposes," 5 U.S.C. § 552(b)(7), the Court must next consider whether the requested disclosures would "reasonably be expected to constitute an unwarranted invasion" of the privacy interests of those whose information has been withheld, *id*. § 552(b)(7)(C).  The first Hardy declaration describes the information the FBI withheld under Exemption 7(C) as consisting of the "names and/or identifying information of" (1) "personnel from Federal Agencies . . . who were responsible for conducting, supervising, and/or maintaining the investigative activities reflected in the documents responsive to [P]laintiff's [FOIA] request;" (2) "FBI support employees and other non-FBI Federal Law Enforcement employees;" (3) "third-party individuals who are of investigative interest to the FBI and/or other law enforcement agencies;" (4) "third parties merely mentioned in the responsive documents;" (5) "an individual who provided information to

_____

[2]  Were the Department to have asserted Exemption 6 but not Exemption 7(C) in withholding certain information, the Court would need to examine the applicability of Exemption 6.  However, "each time the FBI applied Exemption 6 to FBI records containing personal information related to particular individuals, it also applied Exemption 7(C)."  Dkt. 26 at 12; *see also* Dkt. 33-1 at 10–13 (Second Hardy Decl. ¶¶ 21 n.7, 23–25).

the FBI during the course of the investigation described in the responsive documents" after receiving an express assurance of confidentiality; and (6) "local law enforcement personnel responsible for conducting, supervising, and/or maintaining the investigative activities reported in the documents." Dkt. 26-1 at 20–25 (First Hardy Decl. ¶¶ 48–53). Hardy also identifies the specific pages on which each category of information was located and withheld. *Id*. at 22–25 (First Hardy Decl. ¶¶ 49 n.19, 50 n.20, 51 n.21, 52 n.22, 53 n.23). The second Hardy declaration describes the material withheld under 7(C) as falling into the first, second, and third of these categories of information, Dkt. 33-1 at 11–13 (Second Hardy Decl. ¶¶ 23–25), and similarly lists which pages contain each type of redaction, *id*. at 12–12 (Second Hardy Decl. ¶¶ 24 n.8, 25 n.9).

Application of the *SafeCard* rule justifies the FBI's decision not to disclose these names and identifying information. Withholdings in the first and second buckets contain the "names of FBI or other federal government personnel." *CREW II*, 854 F.3d at 681. Information in buckets three, four, and five "identif[ies] private citizens." *Schrecker*, 349 F.3d at 661. And, the information contained in the sixth bucket relates to "local law enforcement personnel," Dkt. 26-1 at 25 (First Hardy Decl. ¶ 53), and, in particular, "investigating agents," *Roth*, 642 F.3d at 1174. All of the individuals within these groups "have a 'substantial interest' in ensuring that their relationship to the investigations 'remains secret.'" *Id*. (quoting *Schrecker*, 349 F.3d at 666). Under the *SafeCard* rule, withholding these types of information is justified to prevent an unwarranted intrusion on those individuals' substantial privacy interests.

The D.C. Circuit has identified only a few situations in which *SafeCard*'s balancing does not hold. Of the two potentially relevant here, neither weighs in favor of disclosure. First, disclosure would be warranted if producing the information were "necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity." *Schrecker*, 349

F.3d at 661 (quoting *SafeCard*, 926 F.2d at 1206).  That is what Spataro has alleged, but "[t]o establish such a public interest and thereby trigger the Exemption 7(C) balancing of public and private interests, the requester 'must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred.'" *Hodge v. FBI*, 703 F.3d 575, 581 (D.C. Cir. 2013) (quoting *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004)).  Here, Spataro offers only his own, unsupported declaration, which sets forth his belief that a cooperating witness was given an improper payment by the Government to testify at his trial and that the Government "withheld critical evidence" from him before his trial, among other improper acts.  Dkt. 24 at 5–6.  Although serious if true, these unsupported allegations alone do not, without more, "warrant a belief by a reasonable person" that the misconduct occurred.  *See Boyd v. Criminal Div. of U.S. Dep't of Justice*, 475 F.3d 381, 388 (D.C. Cir. 2007) (noting that "[u]nsubstantiated assertions of government wrongdoing . . . do not establish 'a meaningful evidentiary showing'" sufficient to overcome invocation of Exemption 7(C)).  The Court therefore concludes that Spataro has not offered sufficient evidence—or, for that matter, any probative evidence—to trigger this exception to the *SafeCard* rule.

Second, disclosure would be warranted if the privacy interests of the individuals the FBI seeks to protect had "been diminished by prior disclosures, including guilty pleas and convictions" that occurred "in connection with" the investigation from which the disputed records arose.  *CREW II*, 854 F.3d at 682–83.  Although the investigations at issue led to criminal prosecutions, *see*, *e.g.*, *Persico*, 293 F. App'x 24, the first Hardy declaration attests that the FBI examined "each responsive page" at issue "to identify non-exempt information that could be reasonably segregated" and concluded that "the only information withheld by the FBI

consist[ed] of information that would trigger reasonably foreseeable harm to one or more interests protected by the cited FOIA exemptions." Dkt. 26-1 at 30–31 (First Hardy Decl. ¶ 65); *see also* Dkt. 33-1 at 10–13 (Second Hardy Decl. ¶¶ 22–25). Spataro, in turn, has failed to identify any *specific* information that was disclosed at trial or otherwise, triggering a diminished privacy interest. Because declarations provided by agencies are generally "accorded a presumption of good faith, which cannot be rebutted by purely speculative claims," *SafeCard*, 926 F.2d at 1200 (internal quotation marks omitted), and because Spataro has failed to identify the specific, putatively private information that he contends has already been disclosed, the Court concludes that this *SafeCard* exception is also inapplicable.

The Court, accordingly, holds that the FBI properly relied on Exemption 7(C).

3. *Exemption 7(D)*

Spataro also challenges the FBI's application of Exemption 7(D) to withhold information on the same seventy pages of records that it released between July and September 2014. To apply this exemption, an agency must show (1) that the records at issue were compiled for law enforcement purposes and (2) that their disclosure "could reasonably be expected to disclose the identity of a confidential source . . . [or] information furnished by a confidential source." 5 U.S.C. § 552(b)(7)(D). For the reasons explained above, the records involved in this case were compiled for law enforcement purposes and thus the first condition is satisfied. The second condition is discussed at length in the first Hardy declaration. Dkt. 26-1 at 25–30 (First Hardy Decl. ¶¶ 54–64).

The Hardy declaration addresses four buckets of information that the Department contends is subject to protection under Exemption 7(D). First, "the FBI protected from disclosure the names, identifying information about, and information provided to the FBI during the course of the investigations at issue here under express grants of confidentiality." Dkt. 26-1

at 27 (First Hardy Decl. ¶ 57). According to Hardy, these individuals "specifically requested that their identities not be revealed due to fear of reprisal . . . [and t]he FBI and/or law enforcement officials expressly promised th[ese] [third parties] that their identit[ies] and the information they provided would not be disclosed." *Id.* (First Hardy Decl. ¶ 57). Second, "the FBI protected the source file numbers of permanent confidential sources of the FBI." *Id.* (First Hardy Decl. ¶ 58). These informants received "assurance[s] of confidentiality" in order to "persuade[]" them "to continue their assistance in providing information to the FBI in the future," *id.* at 28 (First Hardy Decl. ¶ 60), and, according to Hardy, "[d]isclosure of confidential source file numbers at various times and in various documents could ultimately . . . reveal the connections of confidential informants to the information [they] provided," *id.* at 27 (First Hardy Decl. ¶ 59). Third, "the FBI protected from disclosure the permanent source symbol numbers of confidential sources of the FBI," which are assigned "to confidential informants who report . . . pursuant to an express assurance of confidentiality." *Id.* at 29 (First Hardy Decl. ¶ 62). These symbols are used in lieu of the sources' "true names," and, according to Hardy, disclosure of this information could also be used to identify confidential informants. *Id.* at 29–30 (First Hardy Decl. ¶¶ 62–63). Finally, the FBI redacted "the names, identifying information, and information provided by third parties under circumstances in which confidentiality can be inferred." *Id.* at 28–29 (First Hardy Decl. ¶ 61). As Hardy explained, "[t]hese third parties provided information of value concerning the criminal activities of [Spataro] and the Colombo [La Cosa Nostra] Family organized crime members pertaining to murder, drug crimes, and racketeering," and, given the "great peril" these individuals faced, "it is reasonable to infer that [they] cooperated with the FBI only with the expectation of confidentiality." *Id.* at 28–29 (First Hardy Decl. ¶ 61).

As the D.C. Circuit explained in *Campbell v. U.S. Department of Justice*, "[t]o withhold information under Exemption 7(D) by express assurances of confidentiality, the FBI must present 'probative evidence that the source did in fact receive an express grant of confidentiality.'" 164 F.3d 20, 34 (D.C. Cir. 1998) (quoting *Davin v. U.S. Dep't of Justice*, 60 F.3d 1043, 1061 (3d Cir. 1995)). "Such evidence can take a wide variety of forms, including notations on the face of a withheld document, the personal knowledge of an official familiar with the source, a statement by the source, or contemporaneous documents discussing practices or policies for dealing with the source or similarly situated sources." *Id*. Here, "[t]he FBI declaration simply asserts that various sources received express assurances of confidentiality without providing any basis for the declarant's knowledge of this alleged fact." *Id*. at 34–35. Although the Court is sensitive to the FBI's need to protect confidential informants—especially when investigating organized crime—it can satisfy its burden under FOIA without posing any risk to confidential informants. A mere "boilerplate" assertion, however, "will not do." *Citizens for Responsibility and Ethics in Washington v. U.S. Dep't of Justice*, 746 F.3d 1082, 1101 (D.C. Cir. 2014). Thus, if the Department wishes to invoke 7(D), it must provide additional detail, like that discussed in *Campbell*, to carry its burden. *See* 164 F.3d at 34.

On four pages, the FBI has also "protected the names, identifying information, and information provided by third parties under circumstances in which confidentiality can be inferred." Dkt. 26-1 at 28–29 (First Hardy Decl. ¶ 61). Hardy explains that "[t]hese third parties provided information of value concerning the criminal activities of plaintiff and the Colombo [La Cosa Nostra] Family organized crime members pertaining to murder, drug crimes, and racketeering." *Id*. at 28 (First Hardy Decl. ¶ 61). Beyond the general risk of informing police about a violent crime, the danger to these informants was heightened by the "plaintiff and his

associates' violent character," which has been "proven by their [conviction for] criminal activities such as murder, kidnapping, and aggravated assaults." *Id*. at 29 (First Hardy Decl. ¶ 61). Although the assurance of confidentiality cannot be inferred whenever an individual provides information during a criminal investigation, "[m]ore narrowly defined circumstances . . . can provide a basis for inferring confidentiality. For example, when circumstances such as the nature of the crime investigated and the witness'[s] relation to it support an inference of confidentiality, the Government is entitled to a presumption." *U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 181 (1993).

The Court concludes that the circumstances described in the Hardy declaration satisfy this test. As the Supreme Court explained in *U.S. Department of Justice v. Landano*, "[m]ost people would think that witnesses to a gang-related murder likely would be unwilling to speak to the Bureau except on the condition of confidentiality." *Id.* at 179. Or, framed more generally, "[t]he pertinent question is whether the violence and risk of retaliation that attend" the crime about which the source gave information "warrant[s] an implied grant of confidentiality." *Mays v. Drug Enf't Admin.*, 234 F.3d 1324, 1329 (D.C. Cir. 2000). Given the facts described in the Hardy declaration, the Court is satisfied that the violence and risk of retaliation attendant to the activities of the Colombo La Cosa Nostra Family were sufficient to infer that the sources "cooperated with the FBI only with the expectation of confidentiality." Dkt. 26-1 at 29.

4.      Vaughn *Index*

Spataro also contests the Department's failure to provide a formal *Vaughn* index. "Because of its unique evidentiary configuration, the typical FOIA case 'distorts the traditional adversary nature of our legal system's form of dispute resolution.'" *Judicial Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141, 145 (D.C. Cir. 2006) (quoting *King v. U.S. Dep't of Justice*, 830 F.2d 210, 218 (D.C. Cir. 1987)). This results from the "asymmetrical distribution of knowledge"

created by the reality that "the agency alone possesses, reviews, discloses, and withholds the subject matter of the request." *Id*. at 146. To address this disparity, the D.C. Circuit has consistently required agencies to "provide a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply." *Mead Data Ctr., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977). This justification often takes the form of a *Vaughn* index, which presents information identifying the documents withheld or redacted alongside the justifications for not disclosing the requested records. A formal *Vaughn* index, however, is not always required—the D.C. Circuit has observed, "[a]s our post-*Vaughn* opinions make clear, it is the function, not the form, of the index that is important." *See Keys v. U.S. Dep't of Justice*, 830 F.2d 337, 349 (D.C. Cir. 1987) (upholding explanations given through declarations rather than formal indices); *see also Judicial Watch*, 449 F.3d at 146 (same).

The two Hardy declarations, along with the annotations within the documents produced, are sufficient to satisfy the Department's burden as identified in *Mead Data Center*. The first declaration describes the FBI's system for coding documents to explain withholdings. Dkt. 26-1 at 13–15. Each redaction on a produced document is marked with the relevant code, and pages withheld in their entirety are explained through a "Deleted Page Information Sheet" that gives the Bates number of the withheld page along with the relied-upon exemption(s).[3] *Id*. The first

---

[3] For example, with respect to the September 2014 production, the FBI told Spataro that fifty-four pages had been reviewed but only forty pages were produced, "indicat[ing] that 14 pages were withheld without clearly defined or stated justification." Dkt. 24 at 4 (Am. Compl. ¶ 22). The Court notes that a Deleted Page Information Sheet was provided for that production, and that it, together with the first Hardy declaration, adequately justifies the withholding of those fourteen pages. Dkt. 24-3 at 70. Similarly, Spataro appears to have initially argued that 143 pages were withheld in full without proper justification in July 2014. Dkt. 24 at 4 (Am. Compl. ¶¶ 19–20). Although he fails to press this objection further, to the extent his later request for a *Vaughn* index

Hardy declaration, moreover, describes the codes used by the FBI, *id.* at 15 (First Hardy Decl. ¶ 36), and then breaks them down into subcategories that explain with additional particularity the justifications for removing information, *id.* at 15–30. The statutory provisions pursuant to which information was withheld are given, and footnotes listing the Bates numbers of the pages where specific subcategories of information were withheld are included to explain withholdings with greater granularity. *See, e.g.*, *id.* at 16–17 (First Hardy Decl. ¶ 39 & n.11). As noted previously, some of those justifications are unavailing, but not because of the form of the explanation provided. The Hardy declarations and annotations on the documents released to Spataro adequately serve the function of a *Vaughn* index, and thus the FBI need not produce one. *See Hodge v. FBI*, 764 F. Supp. 2d 134, 140–41 (D.D.C. 2011), *aff'd*, 703 F.3d 575 (D.C. Cir. 2013) (describing the sufficiency of a similar declaration from Hardy when combined with "coded references within the production" like those contained in the present productions).

**B.     Adequacy of Search**

"An agency has an obligation under FOIA to conduct an adequate search for responsive records." *Ewell*, 153 F. Supp. 3d at 301. The adequacy of an agency's FOIA search "is judged by a standard of reasonableness," *Weisberg v. U.S. Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984), and "[a]n agency fulfills its obligations . . . if it can demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents,'" *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (quoting *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990)). "In order to obtain summary judgment the agency must show that it made a good faith effort to conduct a search for the requested records, using

---

renews the objection, the Court concludes that the Deleted Page Information Sheets and first Hardy declaration adequately justify the withholdings.

methods which can be reasonably expected to produce the information requested." *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). "[W]hether a search is adequate is determined by methods, not results." *Nance v. FBI*, 845 F. Supp. 2d 197, 201 (D.D.C. 2012). The agency can show that it conducted an adequate search by relying on "[a] reasonably detailed affidavit [or declaration], setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Valencia-Lucena*, 180 F.3d at 326 (quoting *Oglesby*, 920 F.2d at 68) (first alteration in original).

The Department relies on the two Hardy declarations to explain its search methodology. Although Spataro disputes the adequacy of only a single aspect of the FBI's efforts—the remediation of the flood-damaged files—the Court has nonetheless considered the overall adequacy of the various searches that the FBI conducted over a period of twenty-two months. Based on that review, the Court agrees that the FBI has yet to satisfy its burden for the reasons Spataro has identified and concludes that, in all other respects, the searches that the FBI conducted were adequate.

Spataro requested "all records pertaining to [him]." Dkt. 26-2 at 2. According to the first Hardy declaration, the FBI initially responded by searching the general indices to its Central Records System ("CRS") for references to Spataro's name and aliases categorized as a "main entry"—that is, for records where Spataro was the designated subject of the file. Dkt. 26-1 at 7, 10–11 (First Hardy Decl. ¶¶ 18, 26, 27). After Spataro brought suit, the FBI conducted an additional search for records categorized as a "reference entry"—that is, for records where Spataro was merely mentioned or referenced. *Id.* at 7, 10–11 (First Hardy Decl. ¶¶ 18, 26, 27). Because the CRS records sought by Spataro existed within a subset of the CRS—the Automated

Case Support ("ACS") case management system—the FBI conducted these searches through the Universal Index ("UNI") to ACS, "the automated index of the CRS [that] provides all offices of the FBI a centralized, electronic means of indexing pertinent investigative information to FBI files for future retrieval via index search." *Id*. at 8, 10 (First Hardy Decl. ¶¶ 21, 26–27). Hardy attests that "any responsive information would be located" through this search methodology given the time period during which the records sought by Spataro were created.[4] *Id*. at 10 (First Hardy Decl. ¶ 27). Having reviewed both Hardy declarations, the Court has no reason to doubt Hardy's assessment that the queries that he described identified "all files likely to contain responsive records." *Valencia-Lucena*, 180 F.3d at 326 (quoting *Oglesby*, 920 F.2d at 68). The Court, accordingly, concludes that the FBI's efforts up to the point of *identifying* potentially responsive records were reasonable.

The crux of the dispute, however, turns on the tension between the FBI's assertion "that there is no further non-exempt information that can be reasonably segregated and released without revealing exempt information," Dkt. 26-1 at 32 (First Hardy Decl. ¶ 67), and its acknowledgement that "[t]here remain certain cross-reference files that *might* contain responsive records [that] the FBI has tried to secure from a facility that was damaged by Hurricane Sandy." Dkt. 33 at 2–3. According to the second Hardy declaration, there are thirteen of these unreviewed, flood-damaged files: the eleven that the FBI originally identified, Dkt. 33-1 at 2 (Second Hardy Decl. ¶ 5), and the two additional files that it identified in the course of its search for the missing New York Field Office files, *id*. at 5 (Second Hardy Decl. ¶ 8). These files are

_____

[4] Hardy further explains that "the UNI application of ACS also accomplished the task of searching the [Electronic Surveillance ("ELSUR")] indices for any responsive records because "although ELSUR has a different identity from the CRS as a Privacy Act System of Records, the functional task of indexing and retrieving information from both ELSUR and the CRS is accomplished via the UNI application." Dkt. 26-1 at 11 (First Hardy Decl. ¶ 29).

still "awaiting remediation" to address water damage.  Dkt. 33 at 2–3.  As a result, "they are currently not available" to review, and they "may never be available."  *Id.* at 3.  Because "these documents cannot be viewed," the Department contends "it cannot be determined whether those records are truly responsive" and concludes the search need not continue.  Dkt. 30 at 1–2.

The Department has drawn the wrong conclusion from the fact that the files are still "awaiting remediation."  If the FBI reasonably concludes, after the remediation effort is complete, that the files are so severely damaged that they are inaccessible, so be it; the FBI will have made all reasonable efforts, and it cannot be faulted for failing to release records that were, in effect, destroyed.  But, on the other hand, if the remediation process yields records that are both responsive to Spataro's request and non-exempt under FOIA, the FBI should release those records.  The fact that the process has been a prolonged one, and the fact that the FBI does not yet know whether it will bear fruit, does not permit the Court to conclude that the FBI has reasonably exhausted its efforts to locate responsive records.

Finally, the Court notes that an "undue burden" may excuse a failure to search in rare cases.  *Valencia-Lucena*, 180 F.3d at 327.  The FBI, however, has not identified such a burden and, instead, relies only on the fact that the files have not yet been remediated.  The evidence offered by the FBI in describing that process, moreover, cuts against the conclusion that any burden is excessive.  Hardy reports that a "contract has been awarded to start the remediation process for the records stored [at] th[e] facility" at issue, and he gives no indication that progress has not continued throughout this litigation.  Dkt. 33-1 at 2 (Second Hardy Decl. ¶ 5).

The Court will, accordingly, deny summary judgment as to records that might exist in the thirteen damaged files and will direct that the Department file periodic status reports updating the Court and Spataro regarding the ongoing remediation process.  Once that process is complete

in relevant respects, the Court will permit the Department, if appropriate, to file a renewed motion for summary judgment.

## CONCLUSION

The Court will **DENY** the Department's motion to the extent it relies on Exemption 3 to withhold information produced prior to an application under Title III that was not part of the application itself, or uses Exemption 7(D) to protect sources who received express assurances of confidentiality, and to the extent the Department has yet to complete the remediation of the thirteen flood-damaged files, and will **GRANT** the Department's motion in all other respects. The Department may renew its motion for summary judgment with respect to Exemptions 3 and 7(D) but, if it does so, it shall submit the additional evidence described above. The Department may also renew its motion for summary judgment with respect to records that might be found in the flood-damaged files after the remediation process is completed in relevant respects.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: September 29, 2017